UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
           :
LEVEL 12 PRODUCTIONS, LLC,          :
           :
                     Plaintiff,        :        24-CV-00006 (JAV)
           :
                -v-               :        <u>OPINION AND ORDER</u>
           :
MEDIAITE, LLC,           :
           :
                     Defendant.     :
------------------------------------------------------------------X

JEANNETTE A. VARGAS, United States District Judge:

      Plaintiff brought this action under the Copyright Act, 17 U.S.C. § 101 *et seq*. ECF No. 16. Presently before the Court is Defendant's motion for summary judgment, ECF No. 41, and Plaintiff's cross-motion for partial summary judgement on the issues of liability, ECF No. 49. For the reasons set forth below, Defendant's motion for summary judgment is GRANTED IN PART AND DENIED IN PART, and Plaintiff's motion for partial summary judgment is GRANTED IN PART AND DENIED IN PART.

## BACKGROUND

      For purposes of this summary judgment motion, the facts are largely undisputed. *See* ECF Nos. 44 ("Def. 56.1 Statement"), 53 ("Pl. 56.1 Statement"), 55 ("Def. 56.1 Counterstatement"), 58 ("Pl. 56.1 Counterstatement"). Brendan Gutenschwager ("Gutenschwager") is an independent reporter and videographer, as well as the founder of Plaintiff. *See* ECF No. 50 ("Gutenschwager Decl."), ¶ 4. Plaintiff is an entity that owns rights to video recordings and then licenses them for

online and print publications.  *See* Def. 56.1 Statement, ¶ 1.  Defendant is a for-profit business entity and the owner of the news website at the domain name www.mediaite.com (the "Website").   *See* Gutenschwager Decl., ¶¶ 21, 23; Pl. 56.1 Statement, ¶ 6.

On August 27, 2023, Gutenschwager took a video of a rally against new migrant shelters that took place outside Gracie Mansion in New York City ("Video 1").  Gutenschwager Decl., ¶¶ 6-7.  The video, which was eleven seconds in length, pans over a crowd of protesters chanting "send them back."  *Id.* at ¶ 7.  Gutenschwager published Video 1 on his personal X account.  *See Id.*  He captioned the video, "'Send them back!' chants as protesters rally against new migrant shelters outside the NYC Mayor's residence."  McLaughlin Decl., Ex. E.  Video 1 was created for news reporting purposes and contained a watermark when published specifying "@bgonthescene" (Gutenschwager's X handle) to identify Gutenschwager as the owner of Video 1.  *See* Gutenschwager Decl., ¶¶ 9-10.  Video 1 was reposted to numerous other social media accounts, including the X account of @EndWokeness.  McLaughlin Decl., ¶ 18.

On August 27, 2023, Defendant published an article titled "'MOVE BACK!' Massive Brawl Breaks Out At Curtis Sliwa's Anti-Immigration Rally In New York City" ("Article 1") on the Website.  McLaughlin Decl., ¶¶ 15.  Article 1 embedded the post from the public X account @EndWokeness that contained the entirety of Video 1.  *See* Gutenschwager Decl., ¶ 26; McLaughlin Decl., ¶¶ 18-19.  Article 1 reported on the rally depicted in Video 1, Curtis Sliwa's comments at the rally, and his

2

alleged prior arrests. McLaughlin Decl., ¶ 21 & Ex. D.

On October 31, 2023, Video 1 was registered by the U.S. Copyright Office ("USCO") under Registration No. VA 2-437-270. *See* Gutenschwager Decl., ¶ 11. Gutenschwager assigned all rights in and to Video 1 to Plaintiff. *See id.*, ¶ 18. Defendant did not request a license from Plaintiff for Video 1. Def. 56.1 Statement, ¶ 25; ECF No. 58 ("Pl. 56.1 Counterstatement"), ¶ 25.

On April 29, 2023, Gutenschwager recorded a video of Chrissy Teigen and John Legend walking through a protest to the White House Correspondents' Dinner ("Video 2") and published Video 2 on his personal X account. Gutenschwager Decl., ¶ 12-13; McLaughlin Decl., ¶ 11. Video 2 was created to document the protest for news reporting purposes. Gutenschwager Decl., ¶ 15. On May 1, 2023, Defendant published an article titled "'I Can See Underwear': Megyn Kelly Blasts Chrissy Teigen For 'Elitism' at 'Fake, Stupid' WH Correspondents Dinner" ("Article 2") on the Website and embedded a video from Megyn Kelly's YouTube page ("Megyn Kelly Video") in Article 2. *See* McLaughlin Decl., ¶¶ 8-9. The Megyn Kelly Video included 35 seconds out of the total 59 seconds of Video 2, and Article 2 reported on Megyn Kelly's commentary on Video 2, as well as the White House Correspondents Dinner and its attendees. *See id.*, ¶¶ 9, 13-14.

On May 5, 2023, Video 2 was registered by the USCO under Registration No. VA 2-432-309. *See* Gutenschwager Decl., ¶ 17. Gutenschwager assigned all rights in and to Video 2 to Plaintiff. *See id.*, ¶ 18. Defendant did not request a license from Plaintiff for Video 2. *See* Def. 56.1 Statement, ¶ 16.

3

## LEGAL STANDARD

A grant of summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a reasonable jury could render a verdict in favor of the nonmoving party, a genuine dispute of material fact exists. *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (citation omitted). The moving party has the burden of demonstrating the absence of a question of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In forming this assessment, the Court must view all facts "in the light most favorable" to the non-moving party. *See Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002).

In considering cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Bronx Household of Faith v. Board of Educ.*, 492 F.3d 89, 96 (2d Cir. 2007) (cleaned up).

## DISCUSSION

Defendant moved for summary judgment on the ground that (1) based on the Ninth Circuit's "server test" and public policy considerations, the process of embedding does not meet the threshold of copyright infringement and that (2) its use of Video 1 and Video 2 constitutes fair use. *See* ECF Nos. 42 ("Def. Mem. of Law"), 54 ("Def. Opp'n Br."). Plaintiff cross-moved for partial summary judgment

on the issue of liability, asserting that it has established a *prima facie* claim for direct copyright infringement. *See* ECF No. 52 ("Pl. Mem. Of Law"). Plaintiff also argues that the Court should reject both the server test and Defendant's fair use defense. *See* ECF. 56 ("Pl. Opp'n Br."). This Court will address these issues in turn.

### A. Copyright Infringement

A copyright owner has "the exclusive right[s] to—or to license others to—reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of, his copyrighted work." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (quoting 17 U.S.C. § 106). To establish copyright infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (citation omitted). "The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights described in section 106" of the Copyright Act, specifically reproduction, preparation of derivative works, public performance, public display, and distribution. *Arista Recs., LLC*, 604 F.3d at 117 (cleaned up); *see also Nicklen v. Sinclair Broadcast Group, Inc.*, 551 F. Supp. 3d 188, 193 (S.D.N.Y. 2021) (citation omitted).

With respect to the first element, "[a] certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright." *Ferdman v. CBS Interactive Inc.*, 342 F.Supp.3d 515, 524 (S.D.N.Y. 2018) (cleaned up). There is no genuine factual dispute that Plaintiff

5

owns valid copyrights to Video 1 and Video 2.

There is also no dispute that Defendant embedded the two Videos in its articles on the Website without Plaintiff's authorization. Defendant nonetheless contests that, in doing so, it publicly displayed the videos within the meaning of the Copyright Act.

Defendant argues that embedding "directs the browser to the third-party server to retrieve the image [so that] the image appears on the new page, but links to and remains hosted on the third-party server or website." Def. Mem. of Law at 8 (quoting *Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570, 587 (S.D.N.Y. 2020)). Relying on *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1162-63 (9th Cir. 2007), Defendant maintains that providing a link to an image on the original third-party server does not result in a copy or a display of a copyrighted image. Def. Mem. of Law at 7-11.

The Copyright Act defines the term "display" as "to show a copy of [a work], either directly or by means of a film, slide, television image, or any other device or process." 17 U.S.C. § 101. Notably, the courts in this Circuit have overwhelmingly rejected the Ninth Circuit's server test as "contrary to the text and legislative history of the Copyright Act." *Nicklen*, 551 F. Supp. 3d at 195 (reasoning that the Copyright Act defines display as "to show a copy of" a work, not "to make and then show a copy of the copyrighted work"); *see also Lynk Media LLC v. Mediaite, LLC*, No. 24-CV-29 (PKC), 2025 WL 89226, at *3 (S.D.N.Y. Jan. 14, 2025) (compiling cases in the Second Circuit that have rejected the server test). The Court agrees

with Judge Rakoff's thorough analysis of the relevant statutory language in *Nicklen* and holds that, by embedding the Videos, Defendant did display Plaintiff's copyrighted material without authorization. Plaintiff has therefore established a *prima facie* case of copyright infringement.

### B. Fair Use

Fair use is an affirmative defense to a claim of copyright infringement. *See Romanova v. Amilus Inc.*, 138 F.4th 104, 110 (2d Cir. 2025). Specifically, the Copyright Act provides that "the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. The burden of proof to establish fair use rests on the defendant. *Romanova*, 138 F.4th at 110. "Although the issue of fair use is a mixed question of law and fact, the court may resolve issues of fair use at the summary judgment stage where there are no genuine issues of material fact as to such issues." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006) (citation omitted).

### 1. Legal Standard

To evaluate whether a particular use qualifies as fair use, courts must engage in "an open-ended and context-sensitive inquiry" that focuses on four non-exclusive factors: (1) the purpose and character of the use, (2) the nature of the work, (3) the amount and substantiality of the portion used in relation to the

copyrighted work as a whole, and (4) the effect of the use upon the potential market for or value of copyrighted work. *Walsh*, 464 F.Supp.3d at 579 (cleaned up); *see also* 17 U.S.C. § 107.

### a. The Purpose and Character of the Use

The first factor focuses on whether and to what extent the new work is "transformative." *Romanova*, 138 F.4th at 110 (cleaned up). Courts ask if the copy merely "supersede[s] the objects of the original . . . or instead adds something new, with a further purpose or a different character." *Id.* (cleaned up).

In the context of news reporting, a use may be appropriate where "the copyrighted work is itself the subject of the story, transforming the function of the work in the new context." *Barcroft Media, Ltd. v. Coed Media Group, LLC*, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017). In other words, a display of copyrighted video may be transformative "where the use serves to illustrate criticism, commentary, or a news story *about* that work." *Id.* For example, "a news report about a video that has gone viral on the internet might fairly display a screenshot or clip from that video to illustrate what all the fuss is about." *Id.* On the other hand, using a copyrighted work as an "illustrative aid[]" to depict the subject described in an article is not transformative. *Id.*

Although transformative use is the "primary inquiry," courts also consider whether the use was for a commercial purpose and whether the use was in bad faith. *See Ferdman*, 342 F. Supp. 3d at 531 (citation omitted). The commercial nature of the use is not dispositive and should be "weighed against the degree to

8

which the use has a further purpose or different character." *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 531 (2023). As to bad faith, "while the good or bad faith of a defendant generally should be considered, it generally contributes little to fair use analysis." *Ferdman*, 342 F. Supp. 3d at 531 (citation omitted).

### b. The Nature of the Copyrighted Work

Under the second factor, "courts consider (i) whether the work is expressive or creative, with greater leeway being allowed to a claim of fair use where the work is factual or informational; and (ii) whether the work is published or unpublished, with the scope of fair use involving unpublished works being considerably narrower." *Hachette Book Group, Inc. v. Internet Archive*, 115 F.4th 163, 187 (2d Cir. 2024) (cleaned up). This factor, however, "rarely play[s] a significant role in the determination of a fair use dispute." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015) (citation omitted) [hereinafter "*Google Books*"].

### c. The Amount and Substantiality of the Portion Used

The third factor compares the portion of the use with the copyrighted work as a whole to determine if it is "reasonable in relation to the purpose of the copying." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994). Courts consider "not only the quantity of the materials taken but also 'their quality and importance' to the original work." *Walsh*, 464 F. Supp. 3d at 585 (citation omitted). The crux of the inquiry is whether "no more was taken than necessary." *Authors Guild, Inc. v. HathiTrust,* 755 F.3d 87, 98 (2d Cir. 2014) (citation omitted).

### d. The Effect of the Use on the Market

The fourth factor focuses on "whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *Google Books*, 804 F.3d at 223. When analyzing the effect of the infringing use on the market for a copyrighted work, courts ask "whether, if the challenged use becomes widespread, it will adversely affect the potential market for" the work. *Bill Graham Archives*, 448 F.3d at 613 (citation omitted).

### 2. Application

#### a. Video 1

Article 1 reported on a brawl that broke out at an anti-immigration rally outside Gracie Mansion organized by Curt Sliwa, a former mayoral candidate, which led to Sliwa's arrest. McLaughlin Decl., Ex. D. It described Sliwa's comments at the rally, the events leading to the brawl, including the fights that broke out between Sliwa and his supporters and counter-protesters, and the arrests of Sliwa and other protesters. *See id.* Beneath the paragraph discussing Sliwa's engagement in fights with counter-protestors, Defendant embedded an X post from @EndWokeness, which contained Video 1 and @EndWokeness's brief description of the content of Video 1. *Id.*, ¶¶ 18-19, Exs. D & I.

The first factor weighs strongly against fair use. Defendant contends that Article 1 served as "commentary" on Video 1, as Article 1 stated, "[i]n one video,

10

Sliwa himself can be seen having to wrangle a supporter from beating on a masked individual" and later commented on Sliwa's statement on the rally and his arrest history. Def. Mem. of Law at 16. This is misconceived. Video 1 does not feature Curtis Sliwa, let alone an altercation involving a masked individual. To the extent Article 1 can be said to provide commentary regarding a video, it is not Video 1.

In any event, the mere addition of some "token commentary" does not transform the use of a copyrighted work. *McGucken v Newsweek LLC*, 464 F. Supp. 3d 594, 606 (S.D.N.Y. 2020). Defendant simply "repackage[d] or republish[ed]" Video 1 as an illustrative aid to depict what had happened at the rally. *Eliahu v. Mediaite, LLC*, No. 23 CIV. 11015 (VM), 2024 WL 4266323, at *5 (S.D.N.Y. Sept. 23, 2024) (citations omitted).

Defendant relies on *Yang v. Mic Network, Inc.*, *see* Def. Mem. of Law at 16, but *Yang* is distinguishable from this case. 405 F. Supp. 3d 537 (S.D.N.Y. 2019), *aff'd*, 20-4097-cv(L), 2022 WL 906513 (2d Cir. Mar. 29, 2022). In *Yang*, the defendant published a screenshot of a New York Post article, which included roughly the top half of a copyrighted photograph, to "identify the subject of controversy—the [New York Post article]—and to illustrate why the article has been controversial." 405 F. Supp. 3d at 543. In this case, by contrast, Article 1 reported on the anti-immigration rally, rather than any controversy surrounding Video 1.

The other two subfactors, commercial use and bad faith, do not substantially alter this Court's analysis. Defendant does not dispute that the use was commercial

11

in nature. *See* Def. 56.1 Statement, ¶ 30. There is no indication of bad faith, as Defendant's failure to seek permission for copying does not itself amount to bad faith. *See Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006) (citations omitted).

The second factor weighs in favor of fair use. There is no dispute that Video 1 was published on Gutenschwager's X account before Defendant embedded Video 1 in Article 1. Plaintiff argues that Video 1 was creative because Gutenschwager selected "the subject matter, timing, lighting, angle, perspective, depth, lens, and camera equipment used to create the video recordings." Pl. Opp'n Br. at 17. Facing the same argument in *Eliahu*, the court considered the work factual in nature as the plaintiff had no control over the newsworthy contents of the video. *Eliahu*, 2024 WL 4266323, at *6; *see also Barcroft*, 297 F. Supp. 3d at 354 (finding this factor favors fair use when the photographers "predominantly captured their subjects in public" "as they naturally appeared"). Video 1, therefore, is a published, factual work, which tips this factor in Defendant's favor.

The third factor weighs against fair use. Defendant contends that using the entirety of the work is appropriate if the use was "reasonably necessary in relation to the work's transformative purpose and to convey the overall message." Def. Mem. of Law at 18. This argument, however, "hinges entirely on [Defendant's] assumption that its use of [Video 1] is transformative." *Hachette Book Group*, 115 F.4th at 188. Since this Court has concluded that Defendant's use was not transformative, it follows that its embedding of the entire Video 1 on the Website was not necessary. *See Lynk Media, LLC v. Ind. Digital News and Media, LLC*, 24

CIV. 583 (JPC), 2025 WL 2771625, at *19 (S.D.N.Y. Sep. 29, 2025).

The fourth factor likewise weighs against fair use. There is a presumption of market harm when the use of the work is not transformative. *See Ferdman*, 342 F. Supp. 3d at 541 (citation omitted). Courts have recognized that the market for licensing videos to media outlet is a "traditional, reasonable" market for the analysis of this factor. *See, e.g.*, *Nicklen*, 551 F. Supp. 3d at 198 (citation omitted). There would be "no need for news outlets to license the video at all" if each outlet could embed the video without prior authorization from the copyright owner. *Id*. Defendant's embedding of Video 1 was not transformative, and thus the presumption of market harm applies here. Moreover, copying an entire video through embedding, if unrestricted and widespread, would harm the licensing market for Plaintiff's videos.

In sum, the Court finds that the first, third, and fourth factors favor Plaintiff, while the second factor weighs in favor of fair use. Accordingly, the Court concludes that Defendant has not established that its embedding of Video 1 constitutes fair use. This Court therefore denies Defendant's summary judgment motion and grants Plaintiff's motion for summary judgment as to Video 1.

### b. Video 2

Article 2 reports that "[f]ormer Fox News and NBC News host Megyn Kelly criticized model Chrissy Teigen for having 'minions' hold her dress at the White House Correspondents' Association Dinner and protested the 'elitism' of the event during her Sirius XM show." McLaughlin Decl., Ex. A. Above the first paragraph of

Article 2, Defendant embedded the Megyn Kelly Video from YouTube where Megyn Kelly reacted to Video 2, without removing the logos of The Megyn Kelly Show and Sirius XM. *See id.*, Exs. A & B; Am. Compl., Ex. 2.

Article 2 continues, "On SiriusXM's The Megyn Kelly Show, Kelly railed against Saturday's White House Correspondents' Association Dinner, which she has attended in the past." McLaughlin Decl., ¶ 14. Article 2 further comments that Kelly was "reacting to a video which showed Teigen arriving at the dinner with her husband John Legend and three women who held the back of her dress." *Id.* According to the article, "Kelly claimed Teigen's flashy entrance was a picture of 'everything wrong with the elitism . . . the self-importance, the aggrandizement of this fake, stupid event.'" McLaughlin Decl., Ex. A. Article 2 also contains reporting on former President Joe Biden's speech at the event. *Id.*

Applying the fair use factors to Article 2, the first factor weighs in favor of fair use. The facts here are analogous to the record in *Walsh*. In that case, singer Cardi B had posted to Instagram an announcement that her lipstick collaboration had sold out, which featured a copyrighted image of the singer. The defendant embedded the entire Instagram post in an article commenting on the lipstick collaboration. *Walsh*, 464 F. Supp. 3d at 576-77. The court found that the defendant had published the photograph at issue incidentally as a part of its reporting on the Instagram post and the lipstick collaboration. *Id.* at 582. The court concluded that the photograph's function was "wholly transformed in its new context." *Id.* at 583 (cleaned up).

14

In this case, Defendant embedded the Megyn Kelly Video, which incorporated a portion of Video 2, along with Megyn Kelly's "voiceover, commentary, and statements," "video footage showing Megyn Kelly discussing the clip," and "textual captions in the video stating [']The Megyn Kelly Show['] and [']Sirius XM.[']" Def. Opp'n Br. at 7. Defendant's use of Video 2 was not to "present the content of that [video]," *i.e.* Chrissy Teigen walking through a protest to the White House Correspondents Dinner. *Walsh*, 464 F. Supp. 3d at 582. Rather, Megyn Kelly's reaction to Video 2 was "the subject of the story," *Barcroft*, 297 F. Supp. 3d at 352. The use of Video 2 was therefore transformative.

As to commercial use and bad faith, the analysis above for Video 1 also applies here. These two subfactors neither reinforce nor undermine the Court's conclusions.

The second and third factors weigh in favor of fair use. Like Video 1, Video 2 is factual in nature. Plaintiff points to *Kelley v. Morning Bee, Inc.*, and argues that this factor favors copyright holders where the portion used is "a significant percentage" or "essentially the heart" of the copyrighted work. *See* Pl. Opp'n Br. at 18 (quoting *Kelley v. Morning Bee, Inc.*, 21-CV-8420 (GHW), 2023 WL 6276690, at *13 (S.D.N.Y. Sep. 26, 2023)). The court in *Kelley*, however, acknowledged that courts have also considered whether the quantity of the material used was reasonable "in relation to the purpose of the copying." *Kelley*, 2023 WL 6276690, at *13. Here, as the purpose of Article 2 is to inform readers about Megyn Kelly's commentary on Video 2, embedding the Megyn Kelly Video, which includes a

portion of Video 2, was reasonable in relation to that aim. *See Boesen v. United Sports Publications, Ltd.*, 20-CV-1552 (ARR) (SIL), 2020 WL 6393010, at *4 (E.D.N.Y. Nov. 2, 2020) (reasoning that since the story aims to inform readers about Wozniacki's retirement announcement, only reproducing the Wozniacki's Instagram post that includes a cropped version of plaintiff's photograph could achieve that aim).

The fourth factor also weighs in favor of fair use. The presumption of market harm is inapplicable because the Court has determined that Defendant's use of Video 2 was transformative. Since Article 2 serves a different purpose from Video 2, potential purchasers of Video 2 are unlikely to "find reviewing the news article an adequate substitute." *Richardson v. Townsquare Media, Inc.*, 24 CIV. 4217 (AKH), 2025 WL 89191, at *3 (S.D.N.Y. Jan. 14, 2025). *Nicklen*, relied upon by Plaintiff, is not to the contrary. In *Nicklen*, the court was concerned that the widespread adoption of the defendant's use could overtake the licensing market for the plaintiff's video. *Nicklen*, 551 F. Supp. 3d at 198. That is not the case here. Unlike *Nicklen*, where the defendant embedded the entire video as published on the plaintiff's Instagram or Facebook account, Defendant only embedded a portion of Video 2 and did not remove the other elements contained in the Megyn Kelly Video. *See Nicklen*, 551 F. Supp. 3d at 192. Defendant's relatively limited use of Video 2 in an altered version, therefore, would not supplant the market for licensing Video 2.

As all four factors weigh in favor of fair use, the Court concludes that Defendant's use of Video 2 was fair as a matter of law. This Court therefore grants

Defendant's motion as to Video 2 and denies Plaintiff's copyright infringement claim as to Video 2.

## CONCLUSION

For the reasons stated herein, Defendant's motion for summary judgment is GRANTED IN PART AND DENIED IN PART, and Plaintiff's motion for partial summary judgment is GRANTED IN PART AND DENIED IN PART.

The parties are directed to meet and confer regarding next steps in light of the Court's decision, and to submit a joint letter presenting their position as to how to proceed within two weeks of the date of this Opinion and Order.

The Clerk of Court is directed to terminate ECF Nos. 41 and 49.

SO ORDERED.

Dated: December 9, 2025
      New York, New York

                                                JEANNETTE A. VARGAS
                                                United States District Judge